# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-1812

B.E.L.T., INC., *et al.*,

*Plaintiffs-Appellants*,

v.

WACHOVIA CORPORATION,

*Defendant-Appellee*.

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 01 C 4296—**Robert W. Gettleman**, *Judge*.

———————

ARGUED NOVEMBER 3, 2004—DECIDED APRIL 5, 2005

———————

Before FLAUM, *Chief Judge*, and EASTERBROOK and
SYKES, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Lacrad International
Corporation borrowed widely during its existence between
1984 and 2002. Lacrad, which among other activities sold
religious products on digital media, did not practice what it
preached; Rodney T.E. Dixon, its former CEO, pleaded guilty
last fall to fraud and money laundering. CoreStates Bank
had given Lacrad a line of credit in 1997 and also provided
Dixon and other managers with credit cards, which they
used profligately. (CoreStates merged into First Union

National Bank, which has merged into Wachovia Corpora-
tion. We follow the parties' practice and refer to the lender
as First Union.) By 1999, when Lacrad and its managers
owed more than $2 million on the revolving loan and credit
cards combined, First Union had concluded that Lacrad was
a bad risk and stopped making loans, but it accepted
payment on the outstanding balances. Some of Lacrad's
other lenders contend that they furnished Lacrad with the
money used to pay down the First Union debt, and they
want to recoup these funds.

Applying Illinois law to this suit under the diversity
jurisdiction, the district court concluded that plaintiffs lack
a viable legal theory and dismissed the complaint. 2002
U.S. Dist. LEXIS 23637 (N.D. Ill. Dec. 6, 2002). First Union
was only one of many defendants; once the claims against
all of them had been resolved, and the judgment became
final, plaintiffs appealed with respect to First Union alone.

Like the district court, we assume (given the allegations
in the complaint) that First Union knew by 1999 that
Lacrad was financially unstable and suspected ("knew or
should have known," the complaint alleges) that mischief
was afoot. Plaintiffs' principal argument is that First Union
should have told someone—either banking regulators or
fellow lenders—about these suspicions. Had it done so, this
would have led to an investigation (the story goes), and
Lacrad would have collapsed sooner, before plaintiffs sunk
as much money into the venture as they eventually did.

Yet Illinois, like most other states, does not require bus-
iness ventures to do good turns for their rivals. There is little
good Samaritan tort liability in general, and none that re-
quires businesses to assist their competitors. See generally
*Stockberger v. United States*, 332 F.3d 479, 480-82 (7th Cir.
2003). Plaintiffs' claim is weaker than the one rejected in
*Cuyler v. United States*, 362 F.3d 949 (7th Cir. 2004), which
held that even though Illinois requires people to report

apparent child abuse to child-welfare officials, failure to do this does not support a claim by persons who might have been alerted by such reports not to deal with a babysitter or other potential abuser. Substitute "banking regulators" for "child-welfare officials" and you have plaintiffs' theory. The only difference—which cuts against our plaintiffs—is that Illinois law creates a clear duty of notice in child-abuse cases, while there is no equivalently clear rule requiring banks to notify regulators about non-banks' financial problems, and no duty at all for banks to notify other lenders.

What's more, no one is entitled to the benefit of regulatory intervention. See *Heckler v. Chaney*, 470 U.S. 821 (1985). The regulation to which plaintiffs refer, 12 C.F.R. §21.11, requires banks to notify the Treasury Department about "any known or suspected Federal criminal violation." It does not create a private right of action for damages. Yet that's what plaintiffs want—monetary compensation for First Union's (supposed) failure to deem its suspicions grave enough to notify federal law-enforcement officers. It is unnecessary to canvass this ground in more detail, given our recent opinion in *Cuyler*—not to mention the fact that one Illinois appellate court has rejected a claim, essentially identical to the one plaintiffs make, that banks must protect other lenders. See *Popp v. Dyson*, 149 Ill. App. 3d 956, 963, 500 N.E.2d 1039, 1043 (1986). See also *Rankow v. First Chicago Corp.*, 870 F.2d 356, 366 (7th Cir. 1989).

It is not as if First Union were itself accused of fraud. It is not any flavor of "fraud" to omit steps that might have protected strangers from your customers' machinations. Cf. *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir. 1982). There can be no fraud without a representation made with intent to deceive, see *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), and First Union did not make any representation to the plaintiffs. Nor did it have a duty to speak up for their benefit. See *Eastern Trading Co. v. Refco, Inc.*,

229 F.3d 617, 624 (7th Cir. 2000). To the contrary, state law instructs banks not to tell other private parties about their borrowers' activities. See 205 ILCS 5/48.1(c). The federal regulation has a similar confidentiality provision. 12 C.F.R. §21.11(k).

Although plaintiffs cite some decisions for the proposition that anyone who receives funds from a perpetrator of fraud must use that money to make good the losses suffered by other victims, none of them was rendered by an Illinois court (or for that matter a court of any other state). They are federal district-court decisions, which under *Erie* have no authoritative force—and these decisions also lack persuasive force, because they do not explore rules of state law that might support their conclusions. It seems to us, moreover, that plaintiffs misunderstand even these non-authoritative decisions. The opinions to which plaintiffs refer speak of the duties of one who receives the "fruits" of a fraud, which could occur when the operator of a Ponzi scheme rewards some of the early investors with exorbitant returns, inducing them to shill for the venture. See, e.g., *In re Lake State Commodities*, 936 F. Supp. 1461, 1478 (N.D. Ill. 1996). See also *United States v. Frykholm*, 362 F.3d 413 (7th Cir. 2004). Being paid for services rendered is a different thing entirely. Someone who sells a car at the market price to Charles Ponzi is entitled to keep the money without becoming liable to Ponzi's victims for the loss created by his scheme. First Union loaned money to Lacrad at the market price, in the ordinary course of its business, and is presumptively entitled to keep the repayment.

We say presumptively because the best description of what happened here is a preference among creditors. Lacrad retired the First Union debt while leaving other creditors in the lurch. A trustee in bankruptcy could have avoided some or all of the preferential transfer under 11 U.S.C. §547. Lacrad is not a debtor in bankruptcy, however, so the avoiding powers under the Bankruptcy Code are unavailable.

(The parties could not inform us why Lacrad was liquidated outside bankruptcy.) Calling the receipt of a preference "unjust enrichment" does not change matters; a preference by any other name is still a preference and cannot be recovered outside bankruptcy. See *Nostalgia Network, Inc. v. Lockwood*, 315 F.3d 717, 719 (7th Cir. 2002). Anyway, repayment of a loan is not "unjust" enrichment.

A fraudulent conveyance may be recovered independent of a bankruptcy proceeding, see 740 ILCS 160/8, but plaintiffs' claim under Illinois' implementation of the Uniform Fraudulent Transfer Act founders on the statutory text. Lacrad was insolvent when it paid First Union, but provision of "reasonably equivalent value" (740 ILCS 160/5(a)(2)) prevents calling a transfer a fraudulent conveyance unless that transfer occurred "with actual intent to hinder, delay, or defraud any creditor of the debtor" (§160/5(a)(1)). Repayment of an antecedent loan comes within the "reasonably equivalent value" rule—which is just another way of saying that preferential transfers differ from fraudulent conveyances. See *In re Liquidation of MedCare HMO, Inc.*, 294 Ill. App. 3d 42, 50-54, 689 N.E.2d 374, 380-82 (1997); *Crawford County State Bank v. Doss*, 174 Ill. App. 3d 574, 579, 528 N.E.2d 436, 439 (1988).

So did Lacrad repay First Union "with actual intent to hinder, delay, or defraud any creditor of the debtor"? The district judge found the complaint inadequate to allege fraud, which must be pleaded with particularity under Fed. R. Civ. P. 9(b). Although intent may be pleaded generally, the other elements of fraud require details—details that were missing from the complaint and remain missing on appeal. Plaintiffs contend, for example, that "Lacrad used false financial statements to conceal their [sic] true financial status", but this has nothing to do with its motive in paying First Union.

Recall that the gist of plaintiffs' contention is that Lacrad prolonged the fraud, borrowing more money until it finally

collapsed. Paying First Union did not enable Lacrad to stay in business longer; distribution of assets may have made it thirsty for capital, but it also reduced the time it could stay afloat. Plaintiffs have not pointed to any decision from Illinois (or any other state) that treats a comparable payment of a third-party creditor (paying corporate insiders and their cronies is altogether different), which dealt with the debtor at arms' length, as a fraudulent conveyance on the theory that paying an antecedent debt evinces "actual intent to hinder, delay, or defraud any [other] creditor of the debtor".

Plaintiffs do contend that the events demonstrate "badges of fraud," see §160/5(b), but the events they allege differ from those that the statute covers. For example, §160/5(b)(3) deems it evidence of fraud that the transfer or obligation was concealed. Plaintiffs say that Dixon's fraud was concealed, which is true enough, but the *debt* to First Union, and the *transfers* in payment of that debt, were disclosed and transparent. And so on.

This was, or could have been, a case about preferential transfers on the eve of bankruptcy. Because Lacrad never became a debtor in bankruptcy, however, preferences among creditors cannot be reversed; and in the end this is nothing but a preference. Plaintiffs' other arguments have been considered but do not require discussion.

AFFIRMED

No. 04-1812 7

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*